# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 00-899-CR-MORENO/TORRES

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CAMILLA BROE,

        Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS COUNTS 4 - 14 OF THE SECOND SUPERSEDING INDICTMENT AS TIME-BARRED

This matter is before the Court on Defendant Camilla Broe's ("Defendant") Motion to Dismiss Counts 4 - 14 of the Second Superseding Indictment as Time-Barred Under 18 U.S.C. § 3282 [D.E. 117].[1]  Evidentiary hearings were held on December 1 and 11, 2009.  Having carefully considered Defendant's motion and the related filings,[2]

---

[1]    This matter was referred to the undersigned Magistrate Judge by the Honorable Federico A. Moreno for a Report and Recommendation [D.E. 123], pursuant to 28 U.S.C. § 636(b)(1) and S.D. Fla. Mag.J.R. 4.  A second motion to dismiss, on speedy trial grounds, was also referred to the undersigned.  [D.E. 121, 123].  In light of the conclusions reached in this Report and Recommendation, we do not reach the merits of that motion.

[2]    These include the government's Response in opposition to Defendant's motion [D.E. 127]; Defendant's Reply [D.E. 129]; the government's Memorandum of Law on Supplemental Authority [D.E. 144]; Defendant's Supplemental Authority in support of her motion [D.E. 145]; Defendant's filing of the Affidavit of Michael J. Rosen, Esq. [D.E. 146]; Defendant's Amended Response to the government's supplemental authority [D.E. 151]; and the government's filing of the Danish Extradition Order [D.E. 152].

the testimony of the witnesses adduced at the hearings and the evidence admitted therein, the arguments of counsel, and the entire record, the Court reluctantly recommends that Defendant's motion to dismiss the indictment be Granted.

We note that reluctance given the time and effort that went into this case, starting in about 2005, to convince Danish authorities to live up to the spirit and letter of an extradition treaty despite the past practice of not extraditing Danish nationals. It took much time and effort to achieve that correct result under the law. And once that was accomplished, it took additional time and effort by Danish officials to overcome objections to extradition lodged by the Defendant in Denmark. As a consequence, it is well known and has been widely reported that this Defendant is the first Danish national extradited under its extradition treaty with the United States.

The pending recommendation to dismiss this indictment, we respectfully submit, also flows from our judicial system's obligation to follow the law. It results from the government's *inaction* long prior to 2005 – while the statute of limitations in this case was running under federal law. And it results from the fact that the government now, six years after the expiration of that limitations period, has failed to satisfy its burden to invoke a statutory exception that applies to the pending charges. Despite the persuasive and admirable efforts of the government's counsel now charged with that difficult task, the government has not shown that the limitations period was tolled, starting in 2001, when this Danish national left the country to return to her homeland while the investigation underlying the case was pending. The government had to show that she did so with the intent of fleeing prosecution. The government could not

overcome the fact, however, that the record shows that during the time she was supposedly fleeing prosecution, her lawyer was constantly communicating with the government to arrive at an agreed-upon outcome to the charges, providing information to the government at its request, and offering to have the government have direct communication with the Defendant if the government were satisfied with that information.  The government was apparently not satisfied.  But it never advised Defendant of that fact and never asked for a direct communication.  The government indeed sat on the case for over two years prior to obtaining an indictment on charges that were indictable, by the government's own admission, as early as October 2000. The government's inaction, which had nothing to do with the fact that the Defendant was longer in the country, led to the filing of an indictment one month after the limitations period on these particular charges expired.

Faced with this record, and given the credibility findings that we make following the evidentiary hearing, we conclude that we have no choice but to apply the untolled limitations period prescribed by Congress to the pending charges, which requires that the case be dismissed.  As Danish officials have now learned, following the law is not easy in the face of political expediency.   It is hard.  It is equally hard to make this recommendation now.  But the harm that results from leaving a foreign national and admitted drug smuggler unprosecuted are far outweighed by us ignoring the faithful and impartial application of our own federal law to a defendant whose case is squarely governed by it.

## I.    FACTUAL FINDINGS

### A.    _Procedural Background_

This case began with the government investigating the importation of ecstasy tablets into the United States from Europe.  The original Indictment in the case was filed on October 24, 2000 and charged Fernando Luminati-Tonelli with one count of conspiracy to possess with intent to distribute ecstasy.  [D.E. 1].

On March 21, 2003, a Superceding Indictment was filed against Luminati-Tonelli and three (3) co-defendants, including Defendant Broe, a Danish national.  [D.E. 8].  The Superceding Indictment charged Defendant with conspiracy to import ecstasy, conspiracy to possess with intent to distribute ecstasy, and conspiracy to commit money laundering.  The Indictment alleged that each of these conspiracies occurred between January 1995 and October 2000.  A warrant was issued for Defendant's arrest on the same date the Superceding Indictment was filed.  [D.E. 10].

Nearly six and one half years later, on September 3, 2009, a Second Superseding Indictment was filed against Defendant that included the same conspiracy charges set forth in the Superceding Indictment as well as adding eleven (11) new substantive drug counts against her.  [D.E. 101].[3]  These new charges cover nine separate importations of approximately 85,000 ecstasy tablets into Miami from Amsterdam between June 30, 1997 and February 22, 1998.  The government alleges that

---

[3]    Although the three conspiracy counts with which Defendant was originally charged remain in the Second Superseding Indictment, the government cannot and will not prosecute Defendant for conspiracy pursuant to the Rule of Specialty.  [D.E. 99].  Denmark's extradition of the Defendant was limited to the substantive counts of the superseding indictment because Denmark does not recognize criminal conspiracy offenses.

Defendant managed and utilized couriers to carry the drugs from Amsterdam to Miami. More specifically, the government alleges in relevant part that Defendant and co-Defendant Fernando Luminati-Tonelli paid couriers to fly to Amsterdam where one or both of them met the couriers and strapped ecstasy tablets to the couriers' bodies; that the couriers then flew back to Miami and went to Defendant's condominium; and that there, Defendant or another co-Defendant took the tablets from the couriers.

Defendant, who moved from the United States to Denmark sometime between May and July 2001, was arrested in Denmark in December 2007 pursuant to an extradition request by the United States. She challenged the Danish authorities' decision to approve her extradition [D.E. 152] but eventually lost in the Danish courts. She was extradited to the United States on September 4, 2009. She is the first Danish national extradited from Denmark to the United States.

### B.    *Summary of DEA Investigation Relating to Defendant*

Special Agent ("SA") Joseph Kilmer of the United States Drug Enforcement Agency ("DEA") first became aware in late 1998 or early 1999 that someone named "Camilla" who matched Defendant's description was working with Luminati-Tonelli to import ecstasy tablets into the United States. It was not until the summer of 2000, however, that SA Kilmer was able to make a positive identification of Defendant. He learned her identity and that she was living in an apartment in Miami paid for by her boyfriend, Luminati-Tonelli.

Between the summer of 2000 and October 2000, the government's investigation of the drug smuggling ring continued as the government tried to determine the scope

of the operation and who was involved.  By September 2000, SA Kilmer believed the government had enough evidence to indict Defendant for her participation in 1997 and 1998 in the trafficking organization.

On October 24, 2000, the government indicted Luminati-Tonelli on one count of conspiracy to possess with intent to distribute ecstasy.[4]  Defendant was not indicted, and the government continued to investigate the importation ring through March 2003.  SA Kilmer conceded that probable cause existed by that point to arrest the Defendant as well.  In any event, new arrests were being made every few months, resulting in additional evidence about the scope of the conspiracy.  However, SA Kilmer was not able to articulate what evidence was gained after the fall of 2000 that related to the government's case against Defendant.  He acknowledged that the last date on which they had evidence establishing probable cause of Defendant's drug smuggling activities was February 1998.  All parties agree that, under federal law, the limitations period for those substantive offenses would have expired in February 2003.

Yet, not until March 21, 2003, did the government go to the Grand Jury for the return of a Superseding Indictment that named Defendant and three others, including Luminati-Tonelli, which charged them with three conspiracy counts connected with importing ecstasy into the United States.

---

[4]     SA Kilmer explained the reason Luminati-Tonelli was indicted at this time was because agents had been looking for him and finally "got a fix" on him in Thailand. However, by the time the indictment was returned and a provisional arrest warrant obtained, Luminati-Tonelli had already been arrested for crimes committed in another country.  He was eventually tried, convicted, and sentenced in France. Luminati-Tonelli was eventually brought to the U.S. in 2004 or 2005, at which time he agreed to cooperate with authorities.  Defendant had already been indicted by then.

**C.**   ___Government's Communications with Defendant or her Attorney___

On January 24, 2001, well after probable cause existed to charge this Defendant, SA Kilmer first approached her and told her that she was the target of a drug investigation, and advised her to obtain an attorney.  The next day, Defendant and Attorney Waldman met with SA Kilmer and Assistant United States Attorney ("AUSA") David Weinstein regarding her involvement in the ecstasy importation operation.  The AUSA and SA told Defendant they knew she was one of the primary players in an organization that was bringing ecstasy tablets into the United States through the use of couriers; that her boyfriend Luminati-Tonelli was supplying the drugs from the Netherlands; and that Defendant was actively involved in recruiting couriers and in obtaining the tablets back in the United States.

The government hoped through this meeting to gain information from Defendant and obtain her cooperation in the investigation.  Defendant had two conditions for cooperating:  that she not go to jail and that she not be deported to Denmark.  The government did not agree to these pre-conditions and the meeting ended shortly thereafter.

Within a week, Defendant retained criminal defense attorney Michael Rosen. On February 2, 2001, Rosen met with AUSA Weinstein and SA Kilmer about the case. The government told Rosen about Defendant's participation in the ecstasy importation scheme and described her as someone who was not at the top of the organization but not at the bottom, either.  Weinstein may have referred to Defendant as Luminati-Tonelli's "right hand" in the operation.  They discussed how they might resolve the

case, including a negotiated plea and Defendant's cooperation with the government, and the possibility of her wearing a wire was mentioned.

Thus began a series of communications between Rosen and the government about the possibility of Defendant's cooperation and resolution of the case.  *See* Defendant's Comp. Ex. 1.  On February 8, 2001, Rosen spoke with Weinstein by phone. Rosen raised the possibility of immunity for Defendant in exchange for her cooperation. Soon thereafter, Rosen was told the government would not agree to transactional immunity but the topics of indirect immunity and the use of a wire were discussed.

On March 28, 2001, Rosen sent Weinstein a facsimile letter, noting the lack of response to his earlier call and asking for feedback about the case.  Some time thereafter, or at least by July 2001, Defendant decided to return to Denmark.  She informed her lawyer during a conference with counsel conducted on May 9, 2001 of her decision to return to Denmark.

On September 24, 2001, Rosen returned Weinstein's phone call.  Weinstein asked about a "rumor" he had heard that Defendant had left the country.  Rosen responded that he would not answer questions about conversations with his client. Their conversation also covered, among other subjects, the possibility of a proffer.

In mid-October 2001, Rosen had a phone conversation with SA Kilmer during which they discussed a possible plea offer for Defendant as well as her cooperation in the case including the use of a wire.

On November 5, 2001, Rosen met with Weinstein and discussed a proffer letter whereby the government would submit written questions to Defendant.  Although she

would provide the substance of the answers, Rosen would answer the questions in writing himself so as to protect his client.

On November 13, 2001, the government sent Rosen a letter containing ten (10) questions to ask Defendant regarding her involvement in and knowledge of the ecstasy importation operation.

On December 4, 2001, Rosen wrote to Weinstein to confirm his understanding of a conversation they had had one day earlier regarding the terms of the attorney proffer letter.  Rosen closed his letter by noting that if the government were satisfied with the proffer of information, he and Weinstein would discuss a resolution of the matter before any direct communication was had with Defendant.

On December 6, 2001, Weinstein confirmed in writing the terms of the attorney proffer letter.  The AUSA concluded his letter by stating that once he had received the proffer information, he would contact Rosen to discuss a resolution of the matter and then set up a meeting with Defendant.

On December 17, 2001, pursuant to the agreement with the government, Rosen provided written answers to the government's questions.  He anticipated that the questions and answers would be the beginning of the process, and that follow-up questions and a debriefing with Defendant would come after the government had reviewed the answers.

Rosen never received a response to the December 17th proffer letter.  On December 28, 2001, Rosen wrote to Weinstein asking for an update on the status of the

case.  He noted a phone message he had left for the AUSA a few days earlier that had not yet been returned.

On February 2, 2002, Rosen sent another letter to Weinstein, again noting the lack of any response whatsoever to the proffer letter as well as Weinstein's failure to return his many phone messages.

No further communications took place between the government and Rosen or Defendant for the next year and a half.  In August or September 2003, Rosen saw Weinstein in the elevator of the courthouse.  Rosen asked what had become of Defendant's case.  Weinstein responded to the effect that it had "died on the vine" or "it's not happening."  Rosen took this to mean that the case against Defendant had run its course.  He thereafter communicated this statement to Defendant.

Unbeknownst to Rosen or Defendant, the government had determined that the answers provided on December 17, 2001, while fairly truthful, were also incomplete. Based on other evidence the government already had, SA Kilmer believed the answers omitted certain information and minimized Defendant's role in the ecstasy importation ring.  Also unknown to Rosen or Defendant, when Rosen ran into Weinstein in the courthouse elevator in August or September 2003, Defendant had already been indicted.

Between the date of the indictment in March 2003 and the date of Defendant's arrest in December 2007, the government made no attempt whatsoever to contact either Defendant or her attorney about the charges against her.  Both Defendant and Rosen learned about the Superceding Indictment following her arrest.

**D.**   ***Defendant's Departure from the United States, and the Government's Efforts to Bring Her Back***

From 1985 through 2001, Defendant lived continuously in the United States. On May 9, 2001, some four months after the initial meeting with the government, Defendant met with attorneys Rosen and Waldman and told them she was leaving the United States. *See* Defendant's Ex. 2; D.E. 146-1 at ¶ 3.[5] Two and a half months later, on July 20, 2001, she registered her address in Denmark with the Danish authorities.

SA Kilmer first learned that Defendant was no longer living in the United States in early 2002. In January 2003, the DEA country office contacted Danish officials about Defendant's address in Denmark. In early 2004, SA Kilmer was advised that she was living near the U.S. Embassy in Copenhagen. SA Kilmer testified that Defendant's specific location in Denmark was not of major importance to the government, at least not until there was an indictment and arrest warrant for her.

Prior to Defendant's indictment on March 21, 2003, SA Kilmer spoke with his counterparts in the DEA country office in Copenhagen, Denmark, about extraditing her to the United States.[6] He was advised that Denmark would not extradite Defendant, a Danish national, to the United States. SA Kilmer verified this point with the DEA country office again at the time of Defendant's indictment.

---

[5]   Rosen testified that he did not recall any other details of the conversation with Defendant about her departure, and he did not recall whether he ever knew when exactly she left.

[6]   SA Kilmer did not communicate directly with the Danish authorities. That was the responsibility of the attaches in the DEA country office, who then related relevant information to Kilmer.

The government's early plans to bring Defendant back to the United States involved the DEA country office monitoring her travel to see if she would leave Denmark. If so, they might be able to arrest her in that country. Yet, the government for some reason did not consider calling Defendant's attorney back and demanding her return to the United States. Clearly, of course, had they done so and Defendant refused, a strong piece of evidence of intentional flight would have been in this record. That evidence is missing.

Approximately a week after the indictment was returned, SA Kilmer applied for an Interpol "Red Notice." It was issued on April 17, 2003. The Red Notice notified all member states of Interpol that they should stop and detain Defendant if she were found in their country, based on the outstanding arrest warrant in the United States.

As late as June 2004, the DEA country office was still advising SA Kilmer that Denmark would not extradite Defendant.

In mid-2005, SA Kilmer requested that the Red Notice be renewed.

In December 2005, SA Kilmer spoke with two people at the United States Department of Justice's ("DOJ") Office of International Affairs ("OIA") about Denmark's extradition policy. He had been advised by the DEA agents in Copenhagen that the extradition treaty with Denmark had been changed (through the U.S.-Denmark Bilateral Protocol), and they thought this might provide an avenue for Defendant's extradition to the United States.

SA Kilmer spoke first with a paralegal in the OIA. After speaking with people at the Department of State, the paralegal advised SA Kilmer that nothing had changed

in terms of Denmark's policy on extradition and she did not hold out much hope that Defendant's extradition could be accomplished.

SA Kilmer also spoke with Amy Olsen, an attorney in the OIA, on December 16, 2005.  Olsen stated it was her firm understanding, based on conversations with people at the State Department who helped draft the Protocol, that extradition still was not possible.

In April 2006, the DEA country attache told SA Kilmer that extradition might be more of a possibility than in the past.

From June through November 2006, the government began devising a plan to lure Defendant out of Denmark to a country like France that would permit her extradition to the United States.  The plan was to use one of the last defendants arrested in this case to make contact with Defendant.  Preliminarily, agents made a series of recorded calls between the confidential source and Defendant.  The plan needed approval from the Danish government as well as the U.S. government, however, so the DEA country attache met with Danish officials about the matter.  A senior member of the Danish National Police told the attache that Denmark would not approve the plan.  The attache advised that he would raise the issue to a higher level within the U.S. Embassy.

In November 2006, the request to approve the plan to lure Defendant out of Denmark was made a higher level.  SA Kilmer ultimately was advised that the Danish Ministry of Justice would not approve the plan.  The Danes indicated a willingness, however, to accept the case against Defendant for prosecution in Denmark.

Thereafter, the DOJ and DEA asked the OIA to set up a meeting with the Danes. The meeting was held in January 2007 and included several high-ranking Danish officials. SA Kilmer and the AUSA who had taken over the case from David Weinstein were in attendance. The Danish officials were receptive and indicated it was possible though not likely that Defendant's extradition would be allowed. They invited the U.S. to formally request extradition, and alternatively to request that the case be prosecuted in Denmark.

At that point, SA Kilmer began drafting the paperwork necessary for an extradition package. The package was completed then reviewed in the summer of 2007, and officially submitted to Denmark in August 2007.

Defendant was arrested in Denmark in December 2007. She fought extradition but lost. She was extradited to the United States on September 4, 2009. One day earlier, on September 3, 2009, the Second Superseding Indictment was filed which charged Defendant with 11 new substantive drug offenses.

One fact that is indirectly related to the investigation and prosecution of Defendant involves SA Kilmer's job responsibilities during some of the period at issue here. In March 2001, SA Kilmer became DEA press secretary for the Miami Field office. This was the sole case he retained when he was promoted to the new position. From that point through the end of 2004 or beginning of 2005 (when he left the press secretary position), he worked this case "on the side."[7] During this period, he testified

---

[7]     SA Kilmer noted that shortly after he became press secretary, AUSA Weinstein was promoted to a supervisory position in the U.S. Attorney's Office and he, too, worked the case "on the side."

that he did not feel any urgency to push the case forward because he knew the four main targets were outside the country. In terms of time spent on the case, SA Kilmer said his first priority was the press secretary job, but he insisted he spent as much time as needed on the case. And after September 11, 2001, he said he had plenty of time to work on this case because the demands of his press secretary position lessened considerably. Though we readily conclude that SA Kilmer is a generally credible and honorable law enforcement officer doing his duty as best he can, we find that his testimony in this regard is not convincing. His involvement in other matters and duties, unrelated to this case, clearly had more to do with the case standing still than anything else. In other words, we find that the decision not to file these charges prior to the expiration of the limitations period was not related to the Defendant's absence from the jurisdiction, but had everything to do with the agent or the AUSA's obligations on other matters, especially given that so much work had already been successfully done on the case as a whole.

Strong evidence of this conclusion also flows from the fact that, once SA Kilmer resumed his normal duties in February 2005, he ramped up his work on this case. By then, of course, the limitations period had already long expired.

## II.  ANALYSIS

Defendant has moved to dismiss Counts 4 - 14 of the Second Superceding Indictment as time-barred under the applicable five-year statute of limitations, 18 U.S.C. § 3282.[8]  As previously noted, these counts charge Defendant with substantive drug offenses occurring between June 30, 1997 and February 22, 1998.  The Second Superceding Indictment was filed on March 23, 2003, five years and one month after the last-occurring of these offenses.  Thus, the government is barred from prosecuting Defendant for these charges unless, as the government claims, she fled the jurisdiction in 2001, thereby tolling the statute of limitations under 18 U.S.C. § 3290[9] until her return to the United States in September 2009.

Whether Defendant was "fleeing from justice" so as to toll the statute of limitations is a question of fact for our determination.  *United States v. Fonseca-Machado*, 53 F.3d 1242, 1243 (11th Cir. 1995).  In our circuit, "[m]ere absence from the jurisdiction in which a crime occurred *does not* render a suspect a fugitive from justice; he must be found to have absented himself from the jurisdiction with the intent to avoid prosecution."  *Id.* at 1243-44 (emphasis added); *see also Streep v. United States*, 160 U.S.

---

[8]      This section provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282(a).

[9]      This provision states that "[n]o statute of limitations shall extend to any person fleeing from justice."  18 U.S.C. § 3290.

128, 133 (1895) ("it is quite clear that any person who takes himself out of the jurisdiction, with the intention of avoiding being brought to justice for a particular offense, can have no benefit of the limitation"); *Donnell v. United States*, 229 F.2d 560, 565 (5th Cir. 1956) (following *Streep*; in determining whether to toll the statute of limitations, "the purpose and intent of [the defendant's] absence is an important matter to be inquired into" by the factfinder); *United States v. Nabepanha*, 200 F.R.D. 480, 482-82 (S.D. Fla. 2001) (citing *Fonseca-Machado* and holding that both absence and intent are required to find a defendant is a fugitive from justice; defendant's failure to surrender to authorities once he learned of charges against him allowed court to infer his intent to avoid arrest).

The government bears the burden of proving, by a preponderance of the evidence, that Defendant was fleeing from justice and with the intent to do so.  *See, e.g., United States v. Florez*, 447 F.3d 145, 149 (2d Cir. 2006); *United States v. Greever*, 134 F.3d 777, 781 (6th Cir. 1998); *United States v. Marshall*, 856 F.2d 896, 900 (7th Cir. 1988); *United States v. Fowlie*, 24 F.3d 1070, 1072 (9th Cir. 1994).

Preliminarily, we recognize that the statute of limitations may be tolled even though formal proceedings had not yet commenced against Defendant such as by the filing of an indictment against her or issuance of a warrant for her arrest.  As the Supreme Court explained in *Streep*:

> In order to constitute a fleeing from justice, it is not necessary that the course of justice should have been put in operation by the presentment of an indictment by a grand jury, or by the filing of an information by the attorney for the government, or by the making of a complaint before a magistrate.  It is sufficient that there is a flight with the intention of

avoiding being prosecuted, whether a prosecution has or has not been actually begun.

160 U.S. at 133.

The issue here is whether the government has shown, by a preponderance of the evidence, that Defendant left the United States with the intent to avoid prosecution. Defendant did not testify in our proceeding and there are no statements attributable to her from other sources, so there is no direct evidence of what she intended when she returned to Denmark in 2001. The government asks us to infer the requisite intent from circumstantial evidence in the record. The essential facts are not in dispute, but the parties disagree about the inferences that may be drawn from those facts. After careful consideration of the evidence in the record and the well-reasoned arguments made on both sides, we conclude that the government has not met its burden of showing by a preponderance of the evidence that Defendant intended to avoid prosecution when she returned to Denmark. The inference of intentional flight is equally matched by the circumstances in this record that show the absence of intentional flight. Faced with that equipoise, we cannot find that the government has met its burden. Especially where that burden could have so easily been shown by the government's timely demand for a meeting or her return to the jurisdiction prior to the expiration of the limitations period. This would have and could have been done given the Defendant's repeated requests for further communication *from the government*. That did not occur.

Clearly, of course, the government has no obligation to respond in these circumstances. There prosecutorial decisions and judgments are theirs to make. Their only obligation under those circumstances was to timely charge her as required by

federal law.   Otherwise, the government's burden was to lay the clear factual framework for intentional flight sufficient to toll that limitations period, which would have been easily accomplished with one telephone call.   Their failure to do so is what gives rise to the problem we now face six years and a whole drawn out extradition process later.   That is regrettable; but it is one of the government's own making.

### A.   *The Competing Inferences from the Record*

The following is a summary of the facts that the government claims support an inference that Defendant intended to avoid arrest or prosecution when she left the United States.

Defendant had resided in the United States for sixteen (16) years when SA Kilmer approached her on January 2001 and advised that she was targeted for indictment in an ecstasy drug trafficking organization.   The next day, she and her attorney met with the AUSA and SA Kilmer and were presented with evidence of her involvement in the operation.   The government offered her an opportunity to cooperate.  Defendant agreed but conditioned her cooperation on two things:  that she not receive jail time and that she not be deported to Denmark.   The government refused to agree to either condition and advised that she faced jail time.   Within a week, Defendant's newly-hired defense attorney, Michael Rosen, met with AUSA Weinstein and SA Kilmer.   Rosen was told that Defendant was Fernando-Luminati-Tonelli's "right hand" and, based on a conservative assessment, she faced a potential sentencing guideline range of 70 to 78 months if convicted.

For the next eleven months, Mr. Rosen negotiated with the government about Defendant's cooperation in this case. The negotiations culminated in an agreement in November and December 2001 in which defense counsel agreed to answer certain questions posed to Defendant by the government, in an effort to facilitate Defendant's cooperation. And that is what happened: Defendant provided answers to Mr. Rosen, who in turn provided written answers via attorney-proffer to the government on December 17, 2001.

Meanwhile, at some point between May 9, 2001 and July 20, 2001, while the lawyers were negotiating, Defendant left the United States for Denmark.[10] She told her attorney of her impending departure but the government did not learn until early 2002 that she no longer lived here. Despite her long-term residency in this country, Defendant never once returned until she was extradited in September 2009.

The government contends that the aforementioned facts show, by a preponderance of the evidence, that Defendant fled to Denmark with the intent to avoid arrest or prosecution. In particular, the government urges us to examine Defendant's stated conditions for cooperating – no jail time and no deportation to Denmark – alongside the government's immediate rejection of these conditions, as providing a motivation for her to flee and an explanation for why she returned to Denmark after explicitly stating that she did not want to go back. The government also urges us to juxtapose Defendant's 16-year residency in the United States with her failure to return

---

[10]    We are unwilling to impute to Defendant the knowledge that in 2001, she understood that she could not be extradited to the United States under the extradition treaty then in effect. There is simply no evidence to support that suggestion.

after leaving in 2001.  Finally, the government suggests that Defendant's decision to proceed through attorney proffer (a request, the government notes, that was made after July 20, 2001) was suspiciously convenient in that it allowed her to remain in Denmark and prolonged the government's ability to discover her whereabouts.  It is the government's position that these facts, "read in context and not in mere isolation" [D.E. 144 at 3], support a finding that Defendant fled with the intent to avoid arrest or prosecution.

Defendant, however, more persuasively shows that the record supports the opposite, innocent inference.  She is a Danish national and returned to Denmark to be with her family and child.  She knew she was the target of an investigation and likely would go to jail.  She continued her attempts to cooperate with the government.  She claims "a likely and reasonable inference is that she returned home to her family with her child to begin to ease the transition for her eventual incarceration by having her child with her family.  She was thereafter lulled into a false sense of security that the matter had passed without charges based on the comments of the [AUSA] to her counsel."  [D.E. 145 at 6].

Our detailed and lengthy review of this record convinces us that Defendant did not secretly leave the country; she told her lawyer she was leaving, and even the government heard a rumor a few months later that she had left.  For many months after her departure, she continued the cooperation efforts begun prior to leaving, until the government ceased communicating with her.  There is no evidence that after that first meeting in January 2001 she was ever asked to meet with the government again.

In fact, the last few letters between Rosen and the prosecutor contemplate a future in-person meeting between the government and Defendant. The AUSA specifically indicated in December 2001 that, after reviewing the Defendant's formal proffer through counsel, that he would contact counsel to discuss a resolution of the matter and schedule a meeting with the Defendant. And this intent was communicated even though the same AUSA had an indication that Defendant was at that point living back in Denmark. Defendant and her counsel were aware of the government's position in this regard when they prepared and submitted that proffer letter. This took place at precisely the time that the government now contends Defendant was in a state of flight from the jurisdiction with the intent to avoid prosecution. The government's actions in December 2001 simply belie the government's position now that the inferences to be drawn from this record evidence intentional flight.

Although the contemplated meeting never took place, there is little evidence to show Defendant would not have appeared had she simply been asked by the government and her counsel to do so in response to Defendant's proffer letter. Defendant was not under any compunction or order to remain in the United States, and she was never asked to return or told she was wanted by authorities prior to her arrest in 2007. In fact, in the fall of 2003, she was led to believe from statements made by the prosecutor to her lawyer that the case against her had run its course. And although Defendant did not return to the United States until her extradition, there is no evidence in this record that she intentionally avoided doing so prior to the time that the statute of limitations expired.

**B.**     *Application of Section 3290 Precedent*

We find that it would be wholly and unjustly speculative to infer the requisite intent based on this record. Our extensive review of cases applying § 3290 in varying contexts supports that conclusion. In *United States v. Pryor*, 19 Fed. Appx. 234, 237 (6th Cir. 2001), there was no direct evidence in the record that the defendant knew he was wanted by authorities. The Sixth Circuit refused to infer that the defendant was aware he was wanted in order to then infer that he had concealed himself with the intent to avoid prosecution. *Id.* The court held:

> pure speculation is necessary in order to infer from the evidence presented that the defendant was aware that he was wanted by law enforcement authorities. One could speculate that the defendant moved out of his residence and did not return to his storage unit because he was concealing himself in order to avoid prosecution. On the other hand, evidence demonstrates that Pryor continued to use his own name during the time in which he is alleged to have been concealing his whereabouts. Moreover, it is simply not uncommon at this day and age for people to move a couple of times in five or so years. In short, the government has failed to prove by a preponderance of the evidence that the defendant concealed himself with the intent to avoid prosecution.

*Id.*

Of course here Defendant knew she was the target of a criminal investigation, unlike the defendant in *Pryor*. That is why she retained a criminal defense lawyer and why that lawyer was trying to negotiate with the government. For that reason the principle is the same. We would have to rely on unsupported inferences to justify the conclusion, under the totality of the circumstances here, that Defendant left the United States for Denmark in 2001 specifically to avoid arrest or prosecution. This is purportedly the case even though during that same time she is communicating, albeit indirectly, facts to the government that supported at least part of the government's case.

This is purportedly evidence of ongoing flight even though she is offering at this point to wear a wire or further the government's case in some way that would mitigate against her own criminal liability.  We, however, are unwilling to reach the inferences the government seeks to draw in light of this record.  *See, e.g., United States v. Janamadula*, No. 04 CR 166-3, 2006 WL 59399, *2 - *3 (N.D. Ill. Jan. 10, 2006) (finding insufficient evidence of intent during a particular period of time where the government had sufficient evidence to indict the defendant but elected not to because it was still in mid-investigation and because it believed the defendant was out of the country and any effort to reach him by mail or phone would have been fruitless; although the defendant traveled extensively, there was no evidence that he could not have been reached, he traveled with his "green card" and later his U.S. passport, and when summoned to a deposition in his bankruptcy court he appeared); *United States v. Sotelo-Salgado*, 201 F.Supp.2d 957, 964-66 (S.D. Iowa 2002); *United States v. Garcia-Moreno*, 626 F. Supp. 2d 826, 835-36 (W.D. Tenn. 2009).

We acknowledge that the primary focus when ascertaining intent for purposes of § 3290 tolling is on the defendant's conduct, not on what the government did or did not do.  *See, e.g., Pryor*, 19 Fed. Appx. 234, 237.  The government need not prove that law enforcement officers took reasonable steps to locate a defendant.  *See Greever*, 134 F.3d at 780 n.1.  However, "the nature and the extent of the efforts of government agents to locate the defendant is one factor to consider in determining whether it is reasonable to infer from the agent's failure to locate the defendant that the defendant

was acting with the intent to avoid arrest or prosecution." *Id. See also Florez*, 447 F.3d at 152 (quoting *Greever*, 134 F.3d at 780 n.1)).

Sometimes, the government's actions are not relevant at all. For instance, in *Fonseca-Machado*, 53 F.3d at 1244, the Eleventh Circuit looked only at the defendant's conduct when it concluding that he fled from the United States with the intent to avoid prosecution. The court determined that the defendant's act of ordering the pilot of the plane he had just hijacked to fly to Cuba was sufficient evidence of his intent to avoid prosecution for the crime of air piracy. *Id.* Although an arrest warrant was issued at the time, there is no evidence the government made any effort to bring the defendant to trial until he was picked up trying to enter this country illegally, by raft, thirteen (13) years later, at which point he was quickly indicted. *Id.* at 1243. Given the nature of the crime and the blatant evidence of intent to flee justice, and the fact that the defendant fled to a country with which the United States did not have normalized relations, the focus was properly on the defendant's actions.

Here, though, we find the government's efforts to bring Defendant to trial are relevant. The government knew that Defendant was living in Denmark by early 2002 at the latest. A request to Danish authorities regarding her whereabouts was not made for a year, until early 2003, because it was not important to the government to locate her. It would not be reasonable, then, to infer from the government's lack of knowledge of Defendant's whereabouts that she intended to avoid arrest or prosecution.

By contrast, the cases the government cites in support of its burden are not particularly helpful to our analysis because in each instance there is some act by the

defendant, some *evidence* on which to base an inference that the defendant intended to avoid arrest or prosecution.  In ours there is none.

For instance, in *Florez*, 447 F.3d at 153, the Second Circuit affirmed the trial court's finding, based on the totality of the circumstances, that the defendant fled the district with the intent to avoid arrest and prosecution.  In that case, immediately after learning that his brother (and co-defendant) had been arrested, the defendant failed to return to his workplace of twelve (12) years, and he ceased residing in the apartment they had shared.  *Id.* at 152-53.  The fact that he told co-workers that his brother was in trouble, coupled with evidence that the defendant and his brother were joint participants in a large-scale drug trafficking organization, allowed the trial court to infer that the defendant was aware that officers would seek to arrest him, too.  *Id.* at 152.  Other evidence showed that the defendant moved to his native Colombia for a few years.  *Id.* at 153.  Upon his return to New York, he asked a female acquaintance if he could list her Queens address – where he had never lived – as his residence on a New York driver's license application, and he used her bank account – rather than that of the relatives or the friends with whom he was actually residing – to conduct financial transactions.  *Id.*  He even paid her for the use of her account.  *Id.*

The defendant's failure to return to his long-time job and his disappearance from all known New York locations after his brother's arrest; his use of a false address to secure a driver's license; his use of an acquaintance's bank account and his payment for that privilege; and his hasty departure from the bank when the teller tried to confirm his identification documents, all supported the trial court's finding that the defendant

intended to conceal his true whereabouts and avoid any inquiry that might draw official attention to himself and possibly lead to his arrest.  *Id.*

Furthermore, and quite significantly, the Second Circuit concluded that the *government's prolonged inability* to locate the defendant despite numerous efforts over a five-year period supported the trial court's finding that the defendant intended to avoid arrest and prosecution.  *Id.* at 154 (citing *Greever*, 134 F.3d at 780 n.1 (observing that where the government's reasonable efforts to locate the defendant were unsuccessful, the court may infer that the defendant was acting with the intent to avoid arrest or prosecution)).

*Florez* is thus quite distinguishable from our case but actually highlights our conclusion that the government has failed in its burden here.  Defendant, like the defendant in *Florez*, left her longstanding residence and returned to her home country. But the similarity ends there.  In our case, unlike in *Florez*, there is no evidence that Defendant had a steady job or permanent residence from which she suddenly departed. She remained in the United States for at least a few months after learning about the investigation against her.  She cooperated with the government (through her lawyer), both before and after moving to Denmark, including providing answers to questions (through an attorney proffer) that implicated her (perhaps minimally) in the criminal conduct at issue in this case.  She told her lawyer that she planned to leave the country and she registered her address upon arrival in Denmark.  She lived there openly, and traveled out of Denmark a few times using her true identity.  We do not think the

evidence in this case is sufficient to reasonably permit the inference that Defendant acted with the intent to avoid arrest or prosecution.

The decisions in *United States v. Wazney*, 529 F.2d 1287 (9th Cir. 1976), *Brouse v. United States*, 68 F.2d 294, 296 (1st Cir. 1933), and *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976), are similarly distinguishable in that various facts in each case demonstrate the requisite intent to avoid arrest or prosecution, especially when you look to see what actions the government took to locate and timely prosecute those defendants juxtaposed against the actions in this record.

In *Wazney*, authorities were unable to locate the defendant despite an extensive investigation into his whereabouts. 529 F.2d at 1289. The defendant admitted he knew there was an outstanding warrant for his arrest yet he continued to conceal himself. *Id*. Rather than surrender, he had an attorney negotiate on his behalf with state officials until a satisfactory settlement of the state charges against him could be reached. *Id*. The Ninth Circuit found these actions clearly demonstrated the defendant's intent to avoid arrest or prosecution. *Id*. "This knowledge by [the defendant] that he was wanted by the police, coupled with his failure to submit to arrest, is enough to establish the requisite specific intent to avoid arrest or prosecution." *Id*.

In *Brouse*, the First Circuit affirmed the trial court's determination that the defendant fled with an intent to avoid prosecution based on the fact that "[t]here was a striking change in defendant's habits as to his customary places of resort, beginning

almost immediately after the completion of the crime.  It stands wholly unexplained." 68 F.2d at 296.

In *Jhirad*, the Second Circuit affirmed the lower court's determination that the defendant may not have had the intent to avoid prosecution when he left his home country, but he developed such intent a month or so later.  536 F.2d at 483-84.  The defendant knew of the impending criminal investigation against him before he left India for a conference in Brussels; he sold a majority of his law library and other personal effects before leaving; he "adjourned" his private law practice for several months; and he stayed away from India longer than he typically did when attending similar conferences.  *Id.* at 481-83.[11]

Here, while the government need not demonstrate that Defendant concealed herself in Denmark in order to satisfy its burden of proof, there must be some *evidence* on which to base an inference of intent beyond the government's conclusory supposition. Supposition is usually not enough for a court to find that a party has met its burden of showing another's intent.  We see no reason why this case should require a different outcome.

The government then cites the following cases for the proposition that proof of acts of concealment are not necessary to prove a defendant's intent to avoid prosecution. That is a correct statement of the law, but again, the cited cases reflect *some* evidence that supported a conclusion that the defendant was "fleeing justice."

---

[11]     The decision in *Jhirad* is also distinguishable in that it deals with "constructive flight," a notion that has not explicitly been adopted in our circuit for tolling under § 3290 but in any event is not relevant here.

In *Man-Seok Choe v. Torres*, 525 F.3d 733 (9th Cir. 2008), the court found that the defendant committed a "volitional act" of concealment when he clandestinely left Korea after he was stopped at the airport in that country and prevented from boarding a plane; his passport was confiscated and he was questioned on two occasions by Korean authorities regarding criminal activity; and he left Korea without his passport and without informing the Korean government of his departure.  525 F.3d at 741.  The defendant's "secret flight from Korea was a 'significant affirmative step[] to avoid prosecution.'" *Id.* (internal citation omitted).

The defendant in *In the Matter of Extradition of Sven Ulf Ingemar Assarsson*, 687 F.2d 1157 (8th Cir. 1982), did not attempt to conceal himself after moving from Sweden to the United States, but other evidence existed from which the trial court could infer he intended to avoid arrest or prosecution at the time of his departure.  That evidence showed that the Swedish government sought the defendant's arrest for the commission of various crimes, and while the Swedish court did not arrest himm, it imposed certain travel restrictions and reporting requirements on him.  *Id.* at 1158.  The defendant first violated his reporting requirements and then the travel restrictions when he left Sweden.  *Id.*  The court inferred from this evidence that the defendant knew he was wanted by authorities (given the criminal investigation, the reporting and travel restrictions imposed by the Swedish court, and his violation of the court order) and his subsequent failure to submit to arrest.  *Id.* at 1161-62.

Similarly, there was no act of concealment by the defendant in *In the Matter of Extradition of Ferdinand Gino Lang*, 905 F. Supp. 1385 (C.D. Cal. 1995), *after* he

arrived in the United States, but his conduct *prior to* departing Switzerland was sufficient to show he left his home country with the intent to avoid arrest or prosecution. The defendant was interviewed by Swiss authorities, confessed to criminal activity, and was released on his own recognizance without having been charged with a crime. *Id.* at 1389, 1402. Six months later, he told Swiss authorities he was visiting the Netherlands but instead came to the United States and never returned. *Id.* at 1389. At the time he left Switzerland, he was told he would be expected at another interview that was scheduled for the following month. *Id.* He did not return for the interview. *Id.* On these facts, the court concluded that the defendant's actions prior to arriving in the United States evinced an intent to avoid arrest or prosecution. *Id.* at 1402.

Finally, in *Fowlie*, 24 F.3d at 1071-72, the defendant left his ranch in California a few days before it was raided by police, intending to return, but after learning of the raid, decided to abandon it as a home. He moved to Mexico, moved his business there, and after being informed of the raid, told a friend that he would never return to the United States. *Id.* The Ninth Circuit affirmed the trial court's conclusion that the government had shown by a preponderance of the evidence that the defendant acted with the intent to avoid prosecution in California. *Id.* at 1072.

One case cited by the government is more persuasive and merits discussion. In *Ross v. United States*, 168 F.3d 1190, 1192 (10th Cir. 1999), the defendant, then a citizen of the Republic of Ireland, established an investment company in 1976 and over a several year period, solicited millions of dollars from investors, primarily in Northern Ireland. The company went into liquidation in June 1984, but investigators later

determined it was insolvent by mid-1982. *Id.* In October 1983, the defendant moved his residence to the United States but returned to Northern Ireland twice, in December 1983 and February 1984, to solicit additional funds and reassure investors. *Id.* In 1985, authorities in Northern Ireland commenced an investigation into the affairs of the company and, after concluding that the defendant had engaged in fraudulent transactions between December 1983 and March 1984, issued a warrant for his arrest. *Id.* at 1193.

The defendant challenged his extradition to Northern Ireland, claiming that the statute of limitations had expired, but the trial court held the statute was tolled because the defendant had the requisite intent to avoid arrest or prosecution when he moved to the United States. *Id.* The Tenth Circuit found the record supported the trial court's conclusion even though, at the time the defendant moved, Northern Ireland officials had not commenced an investigation or charged him with a crime, and the conduct with which he was charged occurred *after* his move. *Id.* at 1193-94. The Court explained:

> We believe the record supports the district court's conclusion. By October 1983, the investigatory record indicates Mr. Ross was aware of the International Investment's ongoing fraudulent scheme-he knew International Investment used investors' money to make multiple unsecured loans for his benefit and to pay interest to previous investors. Mr. Ross also likely knew International Investment was insolvent or rapidly approaching insolvency, and that International Investment would soon have to submit to a full audit to maintain its Gibraltar banking license, thereby revealing the fraudulent scheme. Based on this evidence, it was not clearly erroneous for the district court to infer Mr. Ross' intent to flee arrest or prosecution.
>
> The fact that Northern Ireland had not yet initiated its investigation does not change this conclusion. An accused may form the requisite intent even though prosecution has not actually begun. . . . In other words, an intent

> to avoid an anticipated arrest or prosecution is sufficient to toll the statute.
>
> We likewise reject Mr. Ross' argument that he did not have the intent to avoid prosecution because the charged conduct occurred after he moved. A prosecutor's decision as to which charges to file is a matter of discretion and involves consideration of many factors.

*Id.* at 1194 (internal citations omitted). The court concluded that the defendant's awareness "of the potential criminality of his conduct and its imminent discovery in October 1983" formed "a sufficient basis from which to infer [the defendant's] intent to avoid an anticipated prosecution." *Id.* at 1195.

The government points out that in our case, unlike in *Ross*, Defendant knew she was under investigation and that her conditions of cooperation – no jail time or deportation – had been rejected. The government claims that this knowledge, combined with her subsequent departure to the very country she had not wanted to be deported to, reveals her intent to flee justice. We decline to so speculate. From her perspective, simply because the government's very initial response to her efforts to cooperate did not include a precondition of no jail time or deportation does not mean that, through additional negotiation through her lawyer, the government's position would not have evolved. The government here seems to take the view that the topic was no longer worth discussing, and that any efforts at cooperation after that initial point are irrelevant. But why would that be the case in the normal course? It is equally plausible to find that Defendant's counsel hoped he would change the government's mind after showing the government the extent of her full knowledge and intent to cooperate. Or, at best, counsel and Defendant could have hoped that any jail time would have been

minimized through her cooperation. Why that possibility is automatically foreclosed is bewildering to us given our collective experience of how pleas and sentences are negotiated all the time. Thus, we do not agree with the government that all her efforts at trying to establish a framework for cooperation and leniency during the time that she was allegedly fleeing prosecution should be ignored.

To the contrary. We find that the circumstantial evidence here does not reasonably support the inference that Defendant intended to avoid arrest or prosecution. The government has not met its burden of proof, minimal though it is. Without the requisite intent, tolling under § 3290 does not apply and dismissal of the charges against Defendant is warranted.

We recognize that dismissal of an indictment in any case is a serious matter and perhaps even more so here, where Defendant has through her attorney acknowledged her participation in an extensive drug trafficking organization, and tremendous amounts of time, effort, and resources have been expended in getting to this point in the case. But we find additional support for our recommendation when we consider the purposes of the statute of limitations and its tolling provision.

> The Supreme Court has explained that the statute of limitations is meant to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before the principle that criminal limitations statutes are to be liberally interpreted in favor of repose[.]

*Toussie v. United States*, 397 U.S. 112, 114-15 (1970) (internal citations omitted).  *See also United States v. Marion*, 404 U.S. 307, 323 (statutes of limitations "represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.").

Thus, the statute of limitations and the tolling provision are designed by the lawmaking branch of government to balance competing interests.  *Marshall*, 856 F.2d at 899.  They "allow the government sufficient time to investigate and prosecute criminal conduct, while shielding the defendant from the burden and jeopardy of confronting distant offenses."  *Id.* at 899-900; *see also United States v. Gonsalves*, 675 F.2d 1050, 1052 (9th Cir. 1982); *United States v. Di Santillo*, 615 F.2d 128, 135 (3rd Cir. 1980).

Congress has determined that when a defendant purposely delays the prosecution of his criminal case by "fleeing from justice," "the balance tips in favor of the government's need to investigate the crime, and the accused should be denied the benefits of the statute of limitations."  *Gonsalves*, 675 F.2d at 1052 (when an accused knowingly conceals himself, even diligent investigators may be thwarted from uncovering facts essential to the prosecution).  The statute of limitations is tolled where the defendant impedes the discovery and prosecution of his case because "his right to avoid prosecution for distant offenses is diminished while the government's need for additional discovery time is strengthened."  *Marshall*, 856 F.2d at 900.

If the statute of limitations is tolled by a defendant's flight because "the failure to prosecute is attributable to the unacceptable conduct of the defendant, *Wazney*, 529 F.2d at 1289, it would be unfair and undermine the purpose of § 3290 "if the accused were held responsible for delays which are attributable to the actions, or more accurately, the inaction, of law enforcement." *Sotelo-Salgado*, 201 F.Supp.2d at 965. Yet, and most significantly here, "[t]here is insufficient justification [] for disregarding the defendant's right of repose[,]" for instance, when he openly leaves the jurisdiction but remains accessible to discovery and prosecution without the intent to avoid arrest or prosecution. *Marshall*, 856 F.2d at 900.

In *Sotelo-Salgado*, for instance, the court found that the government knew about the defendant's crime for over seven years but did virtually nothing to bring him to justice. *Id.* at 966. It could have taken the defendant into custody in November 1994, when an INS agent had probable cause to believe he was an illegal alien. *Id.* at 965-66. But:

> [v]irtually no attempt was ever made by law enforcement to administratively or criminally arrest, indict, or otherwise bring the Defendant into custody. For reasons having nothing to do with Defendant himself, the Government elected not to pursue the case administratively or criminally. In fact, the record indicates that the Defendant's known address was valid for at least five months after the I.N.S. referred the case for prosecution, if not for longer. Indeed, in over seven years, the best efforts to locate the Defendant are reflected by one line in a memorandum indicating that Defendant's known address was no longer valid. What, if any, followup investigation ws ever conducted is questionable.

*Id.* at 966.

Under those facts, the district court refused to toll the statute of limitations even though the government presented evidence that between the defendant's detection and

arrest seven years later, he was twice arrested and on both occasions provided a false name to authorities. *Id.* at 964. The court saw no evidence that the defendant's use of a false name hindered the INS from locating him, and some evidence that even if his true name had been given, the INS would not have been aware of his whereabouts. *Id.* at 964. The court did not deem unsubstantiated evidence of the use of a false name on two occasions sufficient to support a finding that the defendant intended to conceal himself by a preponderance of the evidence. *Id.* at 966.

Moreover, the court concluded that tolling the statute of limitations on those facts would be fundamentally unfair and undermine the purpose of both the limitations and tolling statutes. *Id.* The court held:

> Statutes of limitations are statutes of repose "designed principally to protect individuals from having to defend themselves against charges supported by facts that are remote in time[.]" Accordingly, this Court is guided by the rule that "criminal limitations statutes are to be liberally interpreted in favor of repose." This construction would be severely undermined were the Court to allow the Government, who knew of Defendant's crime for over seven years, to do virtually nothing to bring the accused to justice, but then gain the benefit of section 3290 merely because the accused used false names on two known occasions.

*Id.* (internal citations omitted).

We think it would be fundamentally unfair and undermine the purposes of these statutes if the limitations period were tolled in this case. The government essentially sat on its hands while the clock ticked down. It spent several years collecting additional evidence in the ecstasy importation case, which clearly was its prerogative to do (although we note that it does not appear what if any additional evidence was collected that was helpful to the case against Defendant). A court may not tell the government

how to run its cases, but there are certain rules by which the government as well as the defense must abide.  The statute of limitations is one such important rule essential to the orderly administration of justice and due process.

There is no basis to apply the tolling provision here because nothing Defendant did affected the government's ability to collect evidence in this case, indict her, or otherwise bring her to trial within the proscribed number of years.  The record evidence shows that rather than hindering the investigation while in Denmark, she cooperated with the government, that is, until it ceased responding to the defense.  That Defendant may not have been as forthcoming in responding to the government's written questions as she could or should have been is of no moment.

The government, on the other hand, did little to ensure that the five-year limitations period was met.  According to SA Kilmer, Defendant was indictable in September of 2000, yet the Superceding Indictment was not filed until March 2003.  That was only one month after the five-year limitations period expired.  There is no evidence showing why the government could not have indicted Defendant in February rather than in March.  Again, it is not our role to tell the government when it should indict, but there are consequences for failing, without adequate justification, to satisfy the statute.  The failure to indict Defendant in a timely fashion is attributable solely to the conduct of the government, and justification has not been shown.

It is well-established that criminal statutes of limitation are to be liberally construed in favor of the defendant.  *Marion*, 404 U.S. at 322 n.14; *United States v. Gilbert*, 136 F.3d 1451, 1453 (11th Cir. 1998) (criminal statutes of limitation "are to be

liberally interpreted in favor of repose"). We find insufficient evidence under the unique circumstances in this case to justify disregarding Defendant's right of repose.

For the foregoing reasons, we conclude that Defendant was not "fleeing from justice" for purposes of § 3290 when she left the United States for Denmark in 2001. Accordingly, § 3290 does not apply to toll the five-year statute of limitations. That makes the filing of the Superceding Indictment against Defendant on March 21, 2003, untimely. Thus, we are forced to recommend that Defendant's motion to dismiss based on the argument that the Superceding Indictment is time-barred should be granted.

### III.   CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that

1.   Defendant Camilla Broe's Motion to Dismiss Counts 4 - 14 of the Second Superseding Indictment as Time-Barred Under 18 U.S.C. § 3282 [D.E. 117] be **GRANTED**.

2.   Defendant Camilla Broe's Amended Motion to Dismiss the Second Superceding Indictment for Violation of her Sixth Amendment Right to a Speedy Trial [D.E. 121] be **DENIED as moot**.

Pursuant to Local Magistrate Rule 4(b), the parties have five (5) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996

F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988);

*Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. §

636(b)(1).

  **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 5th day of

January, 2010.

       EDWIN G. TORRES
       United States Magistrate Judge